UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| JASON JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 4:19-cv-00164-TWP-DML |
| | ) |
| DAVID MILLSPAUGH,  JAMEY NOEL, | ) |
| Individually and in his official capacity as Clark | ) |
| County Sheriff, TERESA K. BRADY, | ) |
| LIFESPRING, INC., and CHARLESTOWN | ) |
| PRIMARY CARE, LLC, | ) |
| | ) |
| Defendants. | ) |

**ORDER DENYING DEFENDANT CHARLESTOWN PRIMARY CARE, LLC'S
MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant Charlestown Primary Care, LLC, ("CPC") Motion for Summary Judgment.  (Dkt. 60.)  CPC contracts with the Clark County Jail to provide healthcare to inmates.  Plaintiff Jason Jones ("Mr. Jones") initiated this action under 42 U.S.C. § 1983, alleging that CPC acted unreasonably in response to his serious medical needs during his 5-day detention in the Clark County Jail ("the Jail") and for implementing and maintaining a policy of medical care that is objectively unreasonable in serving the needs of pre-trial detainees at the Jail. CPC contends it is entitled to judgment as a matter of law.  For the following reasons, CPC's motion for summary judgment is **denied**.

**I.  SUMMARY JUDGMENT STANDARD**

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Federal Rule of Civil Procedure 56(a).  Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).

A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any

doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II.  FACTUAL BACKGROUND

The following statement of facts has been evaluated pursuant to the standards set forth above. The facts are considered undisputed except to the extent that disputes are noted.

### A.  Charlestown Primary Care, LLC and the Clark County Jail's Medical Structure

CPC is a limited liability company organized under the laws of the State of Indiana. (Dkt. 7 at 2, ¶ 4; Dkt. 81-1 at 11–12.) From 2008 to 2015, CPC was a private medical practice owned by doctors William Hoke ("Dr. Hoke") and Adam French ("Dr. French"). (Dkt. 81-1 at 11–12.) In 2015, the doctors sold the practice to a national chain but left CPC's corporate entity in place solely to provide medical services to the Jail. (Dkt. 81-1 at 10–11, 15.)

On February 3, 2015, the Clark County Board of Commissioners entered into a contract with CPC, "for the purpose of confirming an agreement wherein Charlestown Primary Care will provide medical services to the inmates of the Clark County Jail . . . ." Dkt. 81-2. The contract specified five items that CPC would be responsible for: 1) once per week visits to the Jail to examine inmates, 2) administering a complete physical exam of any inmate confined for 14 days, 3) providing a female matron to be present for any exams on female inmates, 4) performing services "on call" to the Sheriff or Jail nurse when "professional consultation and advice is needed by such officials," and 5) providing medical treatment and follow up hospital visits for hospitalized inmates. *Id.* Dr. Hoke and Dr. French prepared the contract. (Dkt. 86-1 at 8.) Clark County Sheriff Jamey Noel ("Sheriff Noel") "reviewed it, signed it, basically hired [CPC] to do the medical care for the jail." *Id.* The contract expired by its own terms on December 31, 2015, but CPC continued to serve as the Jail's medical provider until September 30, 2019. (Dkt. 81-1 at 11, 86; Dkt. 62-1.) The version of the contract Sheriff Noel and CPC executed in 2019 had, in

3

relevant part, the same language as the 2015 contract. *Compare* Dkt. 62-1 (2019 contract) *with* Dkt. 81-2 (2015 contract). Paragraph 6.17 of the 2019 contract between CPC and the Jail provided that CPC "agrees to comply with all applicable federal, state and local laws[,] rules, regulations, or ordinances, and all provisions required thereby to be included in this Agreement are hereby incorporated by reference." (Dkt. 81-2 at 8, ¶ 6.17.)

From Sheriff Noel's perspective, CPC served as the Jail's medical director. (Dkt. 81-4 at 2.) Sheriff Noel expected CPC to implement policies and procedures related to medical care. *Id*. In 2018, the Jail revised its policies and procedures on jail operations. (Dkt. 81-5.) According to those policies, CPC was "authorized and responsible for making decisions about the deployment of health resources in the day-to-day operations of the health services program." *Id.* Nursing staff understood that this was CPC's role. (Dkt. 81-6 at 12-13.)

Despite the expectations of Sheriff Noel and delineation of services identified in CPC's contract with the county, CPC only provided once weekly visits to the Jail and answered telephone calls from nurses if they had a question. (Dkt. 81-6 at 7; Dkt. 81-7 at 4-5.) The doctors did not see patients outside of the normal weekly sick call. (Dkt. 81-8 at 4.) Drs. Hoke and French did not conduct the required 14-day physicals, delegating that to the nurses. (Dkt. 81-6 at 5.) Unless specifically asked to do so, they did not review the 14-day assessments conducted by nursing staff. (Dkt. 81-1 at 8.) The doctors also did not review the nurses' notes on patients treated between CPC's weekly visits, even in cases where nursing staff called the doctors for instructions or advice. *Id.* at 7.

Licensed practical nurse ("LPN") Athena Kramer ("Nurse Kramer") has been the Medical Supervisor at the Jail since 2016. (Dkt. 81-6 at 2.) Prior to being hired to work at the Jail in 2014, she had one year of nursing experience and worked as a medical scribe for an allergist. *Id.* at 4. Because an LPN has limited medical training, state regulations require that any medical care they

provide must be provided under the supervision of a more advanced medical professional. *Id.* at 10. Pursuant to these regulations, CPC was responsible for supervising the nursing staff. *Id.* Defendant David Millspaugh ("Nurse Millspaugh"), an LPN responsible for providing medical care to inmates at the Jail, confirmed that CPC was the only entity associated with the Jail that was qualified to provide nursing supervision. *Id.*; (Dkt. 81-7).[1] Despite this obligation, neither the Jail's LPNs nor corrections staff received any training from CPC. (Dkt. 81-7 at 3; Dkt. 81-1 at 9.) CPC never provided any instruction to the nursing staff on what types of situations required a doctor's attention. (Dkt. 81-6 at 9.) There were no written guidelines regarding when the physicians needed to be consulted. *Id.* at 10. According to Dr. Hoke, the only direction offered to the LPNs providing daily care was, "Just make sure that you call us if there's a question. They said -- if they wanted protocols, our only policy was you call us." (Dkt. 81-1 at 6.)

Before Nurse Kramer became Medical Supervisor in 2016, the Jail's medical provider and supervisor was a licensed nurse practitioner. (Dkt. 81-6 at 3, 16.) The nurse practitioner maintained a binder of medical protocols for the Jail. *Id.* When the nurse practitioner was fired, she took the medical protocol binder with her. *Id.* at 3. The binder was replaced by "one paper" with CPC's standards on it.[2] *Id.* at 8. It was not until April 2019 that anyone discussed the Jail's need to have written medical policies. (Dkt. 81-1 at 5; Dkt. 81-6 at 8-9.)

**B.     Events of February 2–7, 2019**

On February 2, 2019, an officer with the Clarksville Police Department arrested Mr. Jones on an outstanding bench warrant. (Dkt. 62-2; 62-3.) During booking at the jail, Mr. Jones reported

---

[1] When describing the scope of medical care that he was allowed to perform, Nurse Millspaugh testified that he cannot hook a needle to a port line, cannot access a port, cannot prescribe medications, cannot diagnose a patient, and must be "under an RN or a LPN in a certain position or a doctor to do our job."( *See* Dkt. 81-7 at 5).

[2] This one-page document is not in the record.

5

on an intake questionnaire that he suffered from chronic illnesses[3], was under the care of a medical doctor, took prescription medications, and recently had been hospitalized.  (Dkt. 62-4.)  If any of the questions on the initial intake questionnaire are answered affirmatively, the medical screening form should be sent to the nurses so that the new arrestee could be seen.  (Dkt. 81-6 at 5; Dkt. 81-7 at 6.)  According to Nurse Kramer, Mr. Jones' medical questionnaire was never given to the nurses.  (Dkt. 81-6 at 14.)  However, the form would have been available to the medical staff through the Jail's electronic management system.  *Id.*

From his arrest until the afternoon of February 4, 2019, Mr. Jones given a jumpsuit, sandals, and a blanket and sent to DT1, also known as the "drunk tank."  (Dkt. 81 at 5; Dkt. 81-11 at 2.)  Johnson remained in the drunk tank until 2:05 PM on February 4, when the Jail's officer in charge placed him into a single cell for protective custody. At that time, Lieutenant Thomas placed Mr. Jones in segregation in a padded cell.  (Dkt. 62-6; Dkt. 81 at 5; Dkt. 81-12.)  Lieutenant Thomas then requested that Teresa Brady, a licensed social worker and mental health clinician employed by Lifespring, Inc., ("Lifespring"), evaluate Mr. Jones' mental health.  (Dkt. 62-7.)  Ms. Brady evaluated Mr. Jones on at least four separate occasions, once per day from February 4 to February 7, 2019.  *Id.*

Jail staff also regularly monitored Mr. Jones and documented their encounters with him.  (Dkt. 62-6.)  The Jail had a policy requiring medical staff to monitor anyone in segregation, (Dkt. 81-15), but medical staff failed to do so, as Nurse Kramer "was not aware that they are supposed to be seen."  (Dkt. 81-6 at 12.)  On the morning of February 6, 2019, Dr. French saw one patient at the Jail who was not Mr. Jones. The Segregation Blotter—a form logging the date, time, and

---

[3] Mr. Jones' chronic conditions are HIV and encephalopathy. (Dkt. 62-5 at 3.) According to the National Institute of Neurological Disorders and Stroke, "Encephalopathy is a term for any diffuse disease of the brain that alters brain function or structure. … The hallmark of encephalopathy is an altered mental state." https://www.ninds.nih.gov/disorders/all-disorders/encephalopathy-information-page (last updated Mar. 27, 2019).

inmates behavior, initialed by the observer—shows that no one associated with the Jail or Lifespring contacted a medical provider affiliated with CPC in relation to Mr. Jones' health during his detention at the Jail. (Dkt 62-6.)

Ms. Brady's mental health encounter notes describe some of Mr. Jones' symptoms and behaviors during his detention. (Dkt. 62-7.) On February 4, 2019, Mr. Jones told her he had a brain injury, and she observed that he struggled to follow correctional officers' instructions. *Id*. at 1. On February 5, 2019, she spoke with Mr. Jones' father who confirmed that he had encephalitis and was HIV positive. *Id*. at 2. His father reported that Mr. Jones abused methamphetamine and Ms. Brady thought he may be experiencing withdrawal symptoms, but Mr. Jones denied using methamphetamine. *Id*. On February 6, 2019, Ms. Brady encountered Mr. Jones sitting naked on the floor of his cell. *Id*. at 3. Mr. Jones was not oriented to his surroundings, was slurring his words, and moaning. *Id*. He claimed he had not been provided food, although food was in his cell untouched. *Id.*

On February 7, 2019, Ms. Brady contacted Clark Memorial Hospital's Behavioral Health Department and reported Mr. Jones' symptoms, which by then included incontinence, incoherence, and lack of orientation; it was recommended that Mr. Jones be admitted to the hospital. *Id.* at 4. As a result, Jail staff transported Mr. Jones to the Clark County Hospital Emergency Department 1709 hours (5:09 p.m.). (Dkt. 62-6 at 3.) In the emergency room, Mr. Jones' doctors noted, "Report from jail states patient has history of encephalitis with increased weakness, incontinence, and 'not eating.'" (Dkt. 81-18 at 4.) His body temperature was recorded at 90.6 degrees, he had multiple sores on his lips and mouth, and a rash "all over skin." *Id.* at 9. Mr. Jones was intubated and admitted to the intensive care unit. He was discharged on February 21, 2019 to a rehabilitation facility. The day before his discharge, nurses noted that Mr. Jones was capable of "nonsensical sounds only." Mr. Jones remained in the nursing home until July 2, 2019.

## III. DISCUSSION

Mr. Jones was a pre-trial detainee when the events described above occurred. The Seventh Circuit recently clarified that a pretrial detainee's medical care claim brought under the Fourteenth Amendment is subject only to the objective unreasonableness inquiry identified in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), rather than the deliberate indifference standard relevant for convicted prisoners. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Under *Miranda*, the proper inquiry is two-steps. "The first step, which focuses on the intentionality of the individual defendant's conduct, remains unchanged [from the deliberate indifference standard] and 'asks whether the [] defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case.'" *McCann v. Ogle County, Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) (quoting *Miranda*, 900 F.3d at 353). In the second step, a plaintiff must demonstrate the defendant's conduct was objectively unreasonable. *Miranda*, 900 F.3d at 353. This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have violated the plaintiff's rights and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable. *McCann*, 909 F.3d at 886. "A detainee must prove more than negligence but less than subjective intent–something akin to reckless disregard." *Miranda*, 900 F.3d at 353.

Because CPC acts under color of state law by contracting to perform a government function, *i.e.* providing medical care to the Jail, CPC is treated as a government entity for purposes of § 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). As such, CPC "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by their employees. They can, however, be held

liable for unconstitutional … policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005–06 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690–91 (1978)).

Therefore, to establish a violation of his rights under the Fourteenth Amendment, Mr. Jones must establish that he suffered a constitutional deprivation as the result of an express policy or custom of CPC. Mr. Jones must show that CPC has: (1) an express policy that, when enforced, caused a constitutional deprivation; (2) a practice that is so wide-spread that, although not authorized by written or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) an allegation that the constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758-759 (7th Cir. 2004); *see also Teesdale v. City of Chicago*, 690 F.3d 829, 833–34 (7th Cir. 2012) (noting policy or custom must be the "moving force" behind the deprivation of constitutional rights). In addition, the failure to make policy itself may be actionable conduct. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).

Mr. Jones argues that CPC's failure to promulgate, review, and train Jail and medical staff on procedures necessary to provide reasonable medical care to inmates resulted in Mr. Jones suffering physical harm, emotional distress, and mental anguish. (Dkt. 1 at 8, ¶¶ 45–48.) He alleges that CPC's failures included:

   a. Failing to train deputies, correctional officers, and medical staff as to the proper methods for dealing with inmates' medical needs;

   b. Failing to provide the … Jail with sufficient, competent medical professionals;

   c. Failing to establish protocols for evaluating and monitoring medical disorders of inmates in the Jail;

   d. Failing to establish protocols for handling medical emergencies in the Jail.

*Id.* at 9, ¶ 51.

CPC presents several arguments in favor of summary judgment that the Court now addresses.

### A.  Whether CPC Had a Duty to Provide Mental Health Services

CPC first argues that Mr. Jones' condition in the Jail involved issues of mental rather than physical health. It characterizes Mr. Jones' encephalopathy as a "mental impairment." (Dkt. 61 at 4.) CPC argues that because the Jail contracted with CPC to provide primary care to inmates and with Lifespring to provide mental health care to inmates, CPC had no duty to intervene in Mr. Jones' care.

Mr. Jones curiously did not respond to this argument. However, CPC provides no expert testimony that a neurological disease such as encephalopathy would be treated by a mental health provider rather than a primary care doctor. Further, Mr. Jones advised Jail staff upon his admission that he was HIV positive, was under the care of a doctor, and had been recently hospitalized, (Dkt. 81-10), and his symptoms at Clark Memorial Hospital included a low body temperature, incontinence, sores, rash, and possible sepsis, (Dkt. 81-18), all of which are physical rather than psychological symptoms.

Because CPC has not presented evidence to support the argument that mental health providers were the proper type of medical provider in these circumstances, summary judgment on this basis is **denied**.

### B.  Whether CPC Had a Duty to Establish Medical Policies and Procedures or Train Non-Employees

Next, CPC argues that they cannot be liable because they did not contract with Sheriff Noel to establish medical policies and procedures or train employees.

The Indiana Jail Standards provide that "[a] licensed physician shall be responsible for medical services at the jail." 210 IAC § 3-1-11(a). "Procedures necessary to deliver medical services to inmates shall be: (1) in writing; (2) approved by the responsible physician; and (3) reviewed by the sheriff." 210 IAC § 3-1-11(b). Mr. Jones contends this regulation places a duty upon CPC to establish medical policies and procedures for the Jail, but CPC argues that the physician's duty is only to approve the procedures, not create them. As noted above, Dr. Hoke and Dr. French drafted the contract that delineated CPC's duties at the Jail, and Sheriff Noel reviewed and signed it.

The Seventh Circuit's decision in *Glisson*, 849 F.3d 372, is instructive. In that case, Corizon, a private company that contracted to provide medical care to inmates within the Indiana Department of Correction ("IDOC"), failed to create a policy or procedure for how medical care providers within the prison system should coordinate care for complex, chronic illnesses. Glisson had serious health problems, including laryngeal cancer, hypothyroidism, depression, and cognitive decline. Glisson and his family advised his healthcare providers upon his incarceration about his chronic illnesses and treatment history, but as he was passed from one provider to the next, no one developed a comprehensive medical treatment plan. A little more than a month after his admittance into IDOC, Glisson died.

The Seventh Circuit held that there was a triable issue as to whether Corizon's decision to avoid promulgating procedures for the management of chronic diseases amounted to deliberate indifference. *Id.* at 381. The court noted that it had long recognized that "'in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable.'" *Id.* at 380 (quoting *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990)). IDOC had promulgated guidelines for managing chronic diseases. Although Corizon's failure to adopt IDOC's guidelines did not alone establish an Eighth Amendment violation, the guidelines' existence, "with which

11

Corizon was admittedly familiar, is evidence that could persuade a trier of fact that Corizon consciously chose the approach that it took." *Id*. Here, a jury could find that CPC's failure to promulgate procedures for implementing adequate medical care was a conscious decision that evinced reckless disregard for detainees at the Jail.

CPC further argues that 210 IAC § 3-1-11(b) is silent as to who is charged with creating procedures, and the language of the regulation shows the jail physician is responsible only for approving the procedures. But here, Drs. Hoke and French *did* draft the contract, and Sheriff Noel's testimony, (Dkt. 81-4 at 2), along with the "Responsible Health Authority" policy, (Dkt. 81-5), makes it plain that Sheriff Noel believed CPC was responsible for creating and implementing policies about the inmates' medical care. Accordingly, there is a question of fact as to whether CPC, upon assuming the role as the medical care provider at the Jail, became the final policy-making authority for creating and implementing medical care policies and procedures. *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 739 (7th Cir. 1999).

CPC also argues that it had no duty to train the medical and Jail staff employed by the county, as training was not one of the duties listed in its contract. In *City of Canton v. Harris*, the United States Supreme Court held that training practices, or lack thereof, may give rise to § 1983 liability. 489 U.S. 378 (1989). The Court found that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Id*. at 387. Where the need for training is obvious, and the absence of training is likely to result in the violation of constitutional rights, a municipal entity may be liable for failure to train its employees. *Id.* at 390; *see also Glisson*, 849 F.3d at 381 (citing *Harris*); *Miranda*, 900 F.3d at 345 (noting *Monell* liability may arise where "the defendant failed to provide adequate training in light of foreseeable consequences" (quotation and citation omitted)). Although the nurses at the Jail were employed by the county, they were supervised by the doctors at CPC. One of the services delineated in the

contract was to be on-call to respond to Jail and nurse staff questions about inmates' medical needs, and a jury could find that the complete absence of training could result in a failure to recognize when an inmate needed medical attention.

Because there are material issues of fact as to whether CPC had a duty to develop and implement policies and train jail or medical staff, summary judgment on this basis is **denied**.

### C. Failure to Establish Policies Did Not Violate Mr. Jones's Rights

CPC next argues that even if it had a duty to establish medical policies and procedures, its violation of this duty would not render it liable under § 1983. In support of this argument, CPC relies on this Court's decision in *Estate of Clark v. Harris*, 2:03-CV-215-LGM-WGH, 2004 WL 2538644 (S.D. Ind. Oct. 19, 2004).

In *Harris*, the sheriff hired a medical doctor to provide medical services at the Vigo County Jail. As here, the terms of the contract required the doctor to respond to calls from the jail for inmates requesting medical care, admit inmates as inpatients at a local hospital when needed, and take calls from the jail's limited practice nurse. The contract did not include any other duties.

The inmate in *Harris* was intoxicated at the time of his arrest, and his booking form indicated that he received previous medical treatment for "alcohol/DTs." Over several days he was monitored by the nurse who concluded that he was suffering from psychological symptoms but did not need to be seen by the jail's doctor. The inmate later died. The jail's doctor was never contacted, never saw the inmate, and was not aware of his incarceration. The plaintiff argued that the jail's medical provider was liable under § 1983 because of his failure to comply with 210 IAC § 3-1-11.

The court first noted that "the violation of a state statute or administrative regulation does not create Section 1983 liability 'unless the right encompassed in the state statute is guaranteed under the United States Constitution.'" *Harris*, 2004 WL 2538644, at *3 (quoting *Moore v.*

13

*Marketplace Rest., Inc.*, 754 F.2d 1336, 1349 (7th Cir. 1985)).  While true, as noted by the Seventh Circuit in *Glisson*, ignoring or violating a regulation may be probative evidence of liability under *Monell*. 849 F.3d at 380.

The court held that the jail doctor could not be liable because he had no personal involvement in the inmate's treatment.  *Harris*, 2004 WL 2538644, at *4.  Like Dr. French and Dr. Hoke, the jail doctors "had no knowledge of the [detainee], his incarceration, or his physical or medical condition."  *Id.*  But here, Mr. Jones is not seeking to hold the doctors personally liable for their treatment decisions; he is seeking to hold CPC liable for failing to promulgate policies that may have prevented his situation.  *See Glisson*, 849 F.3d at 375–76 (acknowledging that the question was not one of liability of any individual medical provider but "whether, because of a deliberate policy choice pursuant to which no one was responsible for coordinating his overall care, Corizon itself violated Glisson's Eighth Amendment rights").

For the foregoing reasons, CPC's reliance on *Harris* is unavailing, and, as discussed in Section B, there are material questions of fact regarding CPC's duties to develop and implement policies in the Jail.

**D.**     **Whether Mr. Jones' *Monell* Claims Fail as a Matter of Law**

Finally, CPC argues that Mr. Jones' policy or practice claims fail as a matter of law.  CPC reiterates the previously rejected claim that Mr. Jones' issues involved Jail employees' response to mental health needs rather than medical needs.  CPC then argues that the evidence shows that Jail staff and Ms. Brady responded appropriately to Mr. Jones' deteriorating condition, and that Mr. Jones fails to show a causal link between CPC's failure to provide additional staffing or to promulgate policies with any alleged constitutional deprivation.

The Court disagrees. Although the Segregation Blotter, (Dkt. 81-13), and Ms. Brady's notes, (Dkt. 81-14), reflect that Mr. Jones was not being ignored entirely, there are questions of

material fact with respect to whether different or more prompt medical care would have affected Mr. Jones' health. And, as discussed above, resolving those questions involves examining whether CPC is at fault for failing to promulgate policies or train staff at the Jail. Accordingly, CPC's argument for summary judgment on this basis fails.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Charlestown Primary Care LLC's Motion for Summary Judgment, (Dkt. [60]), is **DENIED**. The Court will schedule a trial date in a separate entry. Thereafter, Mr. Jones' claims against CPC shall proceed to settlement conference or trial if one is necessary.

**SO ORDERED.**

Date: 2/3/2021

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Laura Elizabeth Landenwich
ADAMS LANDENWICH WALTON, PLLC
laura@justiceky.com

Katherine Elizabeth Tapp
KIGHTLINGER & GRAY LLP (New Albany)
ktapp@k-glaw.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP (New Albany)
jlowe@k-glaw.com

Ashley Roncevic
HOLLINGSWORTH ROBERT MEANS, LLC
aroncevic@hrmlaw.com

Jaime L. Meyer
HOLLINGSWORTH ROBERT MEANS, LLC
jmeyer@hrmlaw.com

Jeffrey D. Roberts
HOLLINGSWORTH ROBERT MEANS, LLC
jroberts@hrmlaw.com

Nicholas J. Davis
O'BRYAN BROWN & TONER PLLC
davisn@obtlaw.com

Tracy S. Prewitt
O'BRYAN BROWN & TONER PLLC
tprewitt@obtlaw.com

16