UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| JASON JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-00164-TWP-DML |
| | ) | |
| DAVID MILLSPAUGH, | ) | |
| JAMEY NOEL Individually and in his official | ) | |
| capacity as Clark County Sheriff, | ) | |
| TERESA K. BRADY, and | ) | |
| LIFESPRING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants Teresa K. Brady ("Brady") and Lifespring, Inc.'s ("Lifespring") (collectively, "Defendants") Motion for Summary Judgment (Dkt.105). Plaintiff Jason Jones ("Jones") initiated this action under 42 U.S.C. § 1983, alleging the Defendants acted unreasonably in response to his serious medical needs during his five-day detention in the Clark County Jail ("the Jail"). The remaining Defendants, Brady, a social worker, and Lifespring, her employer, seek judgment as a matter of law.[1] For the following reasons, the Motion is **denied** as to Brady and **granted** as to Lifespring.

### I. LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1] Mr. Jones has settled his claims against the other defendants. (Dkt. 140 (agreed order of voluntary dismissal for defendant Charlestown Primary Care, LLC); Dkt. 148 (stipulation of dismissal as to defendants Millspaugh and Noel).)

matter of law." Federal Rule of Civil Procedure 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the nonmoving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In ruling on a summary judgment motion, the court views the facts in the light most favorable to the nonmoving party and all reasonable inferences are drawn in the nonmovant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir. 2018).

## II. <u>PRELIMINARY ISSUES</u>

The Court must first address two preliminary issues—(1) whether Jones' Complaint can be construed to include a conditions-of-confinement claim against Brady, and (2) whether exhibits C1–C6 should be struck—before proceeding to the merits of the Defendants' Motion.

### A. <u>Conditions of Confinement Claim</u>

Jones filed his Complaint on July 26, 2019, alleging that the Defendants took "unreasonable actions in response to [his] serious medical needs" and implemented and maintained an objectively unreasonable policy of medical care for detainees in the Clark County Jail. (Dkt. 1 at ¶ 1.) For Count I of his Complaint, Jones included as a subheading "***Failure to Provide Medical Care (against Defendants Brady and Millspaugh)***" and alleged that "Brady was repeatedly and objectively unreasonable in failing to secure him necessary medical attention despite Brady's knowledge of Jones's medical conditions." *Id.* at 6-7 (bold and italics in original).

2

In his response to the Defendants' Motion for Summary judgment, Jones raises a claim that Brady violated his Fourteenth Amendment due process rights by unreasonably failing to respond to Jones's need for basic necessities such as hygiene products, a mat to sleep on, clean clothes, and access to the restroom. (Dkt. 125 at 15–18.) He argues that a conditions-of-confinement claim was properly pled in his Complaint because the Complaint asserts that the defendants violated his Fourteenth Amendment due process rights and cited to Brady's notes documenting Jones's decline. *Id.* at 18.

A plaintiff does not need to plead specific legal theories in his complaint if "the facts alleged give adequate notice to the defendant of the basis of the suit." *Wudtke v. Davel*, 128 F.3d 1057, 1061 (7th Cir. 1997). But Jones did not plead factual content that would put Brady on notice that he was bringing a conditions-of-confinement claim. *See Ashcraft v. Iqbal*, 556 U.S. 662, 678 (2009). Jones alleges that Brady observed him naked in his cell where he reported being cold and that the day he was sent to the hospital she noticed that his clothes and blanket were wet with urine. (Dkt. 1 at ¶¶ 21, 25.) But these facts were tied to his allegations that Brady and others failed to seek medical attention. *Id.* at ¶ 22. Nowhere in the Complaint did Jones allege that Brady acted unreasonably by failing to provide him with basic necessities.

"A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997). And Jones has not moved for leave to amend his pleadings to add a claim related to the conditions of his confinement. Pursuant to the amended case management plan, he had through March 18, 2020 to do so. (*See* Dkt. 23 at 3 (setting December 18, 2019 deadline), Dkt. 59 (extending deadlines by three months).) If Jones moved to amend his complaint now, over a year after the deadline, he would be required to show good cause. *Arrigo v. Link*, 836 F.3d 787, 797 (7th Cir. 2016). Given the undue delay and prejudice to the Defendants, Jones would not fare well

in that effort. *See Heng v. Heavner, Beyers & Mihlar, LLC,* 849 F.3d 348, 354 (7th Cir. 2017) (noting that district courts have broad discretion to deny leave to amend due to delay and prejudice to the defendants).

In short, Jones did not plead a conditions-of-confinement claim in his Complaint. The Court will not discuss facts related to that claim except to the extent that they relate to Jones's health status.

### B. Video Exhibits

In their reply, the Defendants object to the admission of exhibits C1–C6, a series of video recordings from within the jail that show, in part, interactions between Brady and Jones. The Seventh Circuit has found that when "the recording contains inaudible or unintelligible portions, the decision of whether to admit it in evidence is committed to the sound discretion of the trial court." *Vukadinovich v. Zentz*, 995 F.2d 750, 753 (7th Cir. 1993) (internal citation omitted). The Court has reviewed the videos and concludes that the unintelligible portions are not "so substantial as to render the recording as a whole untrustworthy." *United States v. Powers*, 75 F.3d 335, 341 (7th Cir. 1996) (internal citation omitted). Despite ambient jail noise, the audible portions of the video are relevant to show when Brady was aware of Jones's declining health. Accordingly, the objection is **overruled**.

### III. FACTS

The following statement of facts has been evaluated pursuant to the standards set forth above. The facts are considered undisputed except to the extent that disputes are noted.

### A. Lifespring and Teresa Brady's Role at Clark County Jail

Lifespring is an Indiana-based corporation that provides mental health services to inmates at Clark County Jail. (Dkt. 1 at ¶ 10; Dkt. 107-2 at 1.) Lifespring has a written policy manual, (Dkt. 125-15), but it is largely inapplicable to its duties at the Jail, (Dkt. 125-5 at 67:19–68:7.)

Instead, Lifespring follows the directives and policies of the Jail for services provided within the Jail. (Dkt. 107-2; Dkt. 107-9 at 2.) According to their contract with the jail, Lifespring's duties include mental health screenings consisting of an assessment of suicide risk, mental status, and substance abuse; court-ordered mental health, competency, and insanity evaluations; psychiatric services up to three hours a week, including inmate consultations and medication checks; group and individual counseling; and mental health training. (Dkt. 107-2 at 2–3.) Lifespring does not provide medical care to inmates at the jail; that role belongs to a company called Charlestown Primary Care, LLC. (Dkt. 107-9 at 2; Dkt. 115-3.)

However, collaboration between the mental health and medical providers is expected. According to Jail Policy 403, Lifespring's duties include stabilizing mentally ill inmates to prevent psychological deterioration and consulting with a physician and jail staff whenever a mentally ill or intellectually impaired inmate's "adaptation to the correctional environment is significantly impaired." (Dkt. 125-14 at 1–2; Dkt. 125-5 at 95:14–18 (Brady Deposition). If a Lifespring employee conducted a mental health screening and observed physical health issues, it was expected that he or she would consult with medical to formulate an appropriate treatment plan. (Dkt. 125-13 at 15 (Kramer Deposition 71:3–24.)[2]

Brady is a licensed social worker employed by Lifespring who has worked full-time at the Jail since July 2015. (Dkt. 107-1 at 1–3.) Besides her duties with clients, she participates in twice-monthly meetings with jail medical staff before clients in her care are seen by the nurse practitioner or doctor. (Dkt. 125-5 at 98:24–99:12.) She also facilitates an annual mental health training program for jail staff. *Id.* at 30:6–10.

---

[2] Where the party includes only excerpts of a deposition, the Court will first refer to the page of the PDF of the exhibit and then to the page and lines of the deposition.

Brady recognizes that mental health and physical ailments can be co-existent and that it can be difficult to differentiate the two. *Id.* at 61:14–16. When she observes a client with physical health issues, she does not generally contact medical because her role is to be concerned with mental health. *Id.* at 61:7–10. Inmates with manifested health issues are usually already being tended to by the medical department. *Id.* at 62:2–7. She could not recall an occasion where she reached out to medical staff regarding an inmate's healthcare. *Id.* at 63:8–24. When she believes a client needs psychotropic medication, she contacts the Lifespring physician Dr. Jaggers or the nurse practitioner to prescribe medication. *Id.* at 32:20–22, 62:21–63:3. It is outside the scope of her professional practice to evaluate and treat clients undergoing drug withdrawal, as they must be under a nurse or doctor's care. *Id.* at 16:20–25; 90:11–14.

**B.     Events of February 2–7, 2019**

Jones was arrested on a bench warrant on February 2, 2019, and taken to the Jail. During booking, Jones completed a medical intake questionnaire where he reported that he was taking medications, was under a doctor's care, had been recently hospitalized with a blood infection, and was HIV positive. (Dkt. 125-1.) When an inmate reports any medical issues on the intake questionnaire, it should be printed and placed in the medical box for pickup by medical staff so the inmate can be seen by medical staff to establish medical care. (Dkt. 107-4 at 2–4 (31:24–33:25).) Medical staff never saw Jones, which indicates that his questionnaire likely did not make it to the medical box. *Id.* at 3–4 (32:22–33:4).

From his arrest until the afternoon of February 4, Jones was placed in DT1, also known as the "drunk tank". (Dkt. 125-2.) Around 11:45 a.m. on February 4, Lt. Thomas asked Brady to evaluate Jones. (Dkt. 125-4 at 1; Dkt. 125-3, C-1.) Jones informed Brady that he had encephalitis

and a brain injury. (Dkt. 125-3 at 11:44:30 (0:55).)[3] Brady documented the encounter, noting that Jones reported a brain injury, that he appeared to have cerebral palsy based on his movement, that he was having difficulty following correctional officers' instructions, and that he had been in the care of several doctors. (Dkt. 125-4.) Jones also told Brady that he was being released that day, so she noted she would follow up if he was not released "to facilitate any medication or mental health care." *Id.*

At 2:05 p.m., Lt. Thomas placed Jones in segregation in a padded cell called PC1. (Dkt. 125-7.) There is no bathroom in PC1. (Dkt. 125-6 at 12–16.) Further, an inmate in PC1 does not have access to the kiosk to submit a medical care request. *Id.* at 5–7. Rather, jail staff must let an inmate out of the cell to use the restroom or to access the kiosk. *Id.* at 6–7; 13–14.

Around 9:10 a.m. on February 5, Brady saw Jones in his padded cell. (Dkt. 125-3, C-3.) Jones asked several questions which are inaudible on the video, but Brady responded that she did not know the answer and "I need to talk to medical, so I'll get back with you." *Id.* at 9:11:15–45 (1:58). Brady wrote on the log outside Jones's cell, "seen by LS remain on LS watch." (Dkt. 125-7.)

Lifespring or "LS" watch means that an inmate is "inappropriate" to go to general population. (Dkt. 125-5 at 119:12–18.) An inmate on LS watch is checked on an hourly basis by jail staff to make sure the inmate is okay. *Id.* at 120:11–13. Brady could not recall why she placed Jones on LS watch, besides that she "didn't feel like he was appropriate to go" to general population. *Id.* at 122:6–14.

Sometime that morning, Brady spoke with Jones's father who confirmed that he had encephalitis, was HIV positive, had been recently hospitalized, and abused drugs, namely meth.

---

[3] The CDs that were originally filed as exhibits C1–C6 did not work. The CDs subsequently filed by Mr. Jones do not have the timestamp that Mr. Jones cites in his brief. The Court uses the timestamps provided by Mr. Jones and, in parentheses, the time in the functioning video file.

7

*Id.* at 130:11–17; Dkt. 125-4 at 2. Brady met with Jones to discuss what she learned. (Dkt. 125-4 at 2.) Based on Jones' involuntary jaw movements, Brady thought he might be experiencing withdrawal symptoms, but Jones denied drug use. *Id.* at 188:21–189:4; Dkt. 125-4 at 2. During this encounter with Jones, Brady told him, "I need to pass this on to medical." (Dkt. 125-3 at C-4 at 12:18 (5:50).) In her notes from this encounter, Brady observed Jones to be anxious with poor memory and poor insight. (Dkt. 125-4 at 2.) Brady could have contacted medical at this time, but she did not because she was "still gathering information about him." (Dkt. 125-5 at 131:11–12.)

Jones missed his court hearing that afternoon because no one escorted him. (Dkt. 125-9.) He spent much of that evening trying to access the bathroom before he resorted to urinating in a styrofoam cup. (Dkt. 125-10.)

On February 6, Brady, accompanied by another Lifespring employee and an intern, checked on Jones at 2:15 p.m. (Dkt. 125-3, C-5.) Jones was naked, so Brady asked why his clothes were off. *Id.* at 2:17 (:13). Jones told her he was cold and asked for water, and Brady responded, "well, you've got two cups right there." *Id.* at 2:18:02 (:56). Brady did not know that the cup had urine in it. (Dkt. 125-5 at 142:7–14.)

The Lifespring staff then left to discuss Jones with jail staff. An officer asked Brady whether Jones needed to be in a cell by himself. (Dkt. 125-3, C-5 at 2:23:50 (6:40).) Someone can be heard saying, "he's not normal." *Id.* at 2:25:40 (8:29). Jones can be heard moaning in the background, at one point stating, "water, water." *Id.* at 2:27:29 (10:22). Staff do not respond to Jones' request for water. *Id*. Brady's notes of this encounter state that Jones was not oriented to his surroundings, was not eating, was difficult to understand, was making moaning sounds, and his speech was slurred. (Dkt. 125-4 at 3.)

Brady knew Jones's condition was deteriorating on February 6, but she took no steps to address it that day. (Dkt. 125-5 at 138:10–15.) Brady did not recall Jones asking for medical care;

8

if he did, she would have directed him to write a medical inquiry. (Dkt. 125-5 at 177:2–25.)

On February 7, Brady returned to Jones's cell where she observed that he was moaning, his blanket and jumpsuit were wet with urine, his speech was incoherent, and he was disoriented. (Dkt. 125-4 at 4.) Brady told Jones that she was going to send him to the hospital. (Dkt. 125-3, C-6 at 1:05:51 (:48).) Brady contacted Clark Memorial Hospital's Behavioral Health Department and, based on his reported symptoms, they recommended that he be sent to the emergency room. (Dkt. 125-4 at 4.)

Jail staff transported Jones to the Clark County Hospital Emergency Department around 5:10 p.m. (Dkt. 125-7 at 3.) In the emergency room, Jones' doctors noted, "Report from jail states patient has history of encephalitis with increased weakness, incontinence, and 'not eating.'" (Dkt. 125-12 at 4.) His body temperature was recorded at 90.6 degrees, he had multiple sores on his lips and mouth, and a rash "all over skin." *Id.* at 1. Jones was intubated and admitted to the intensive care unit. *Id.* at 3. He was discharged on February 21 to a rehabilitation facility. *Id.* at 6. The day before his discharge, nurses noted that Jones was capable of "nonsensical sounds only." *Id*. at 3. Jones remained in the nursing home until July 2, 2019.

After Jones left the jail, Lifespring did not evaluate Brady's conduct with him, nor did it discipline her. (Dkt. 125-5 at 150:6–8, 164:1–7.)

## IV. **DISCUSSION**

Jones was a pre-trial detainee when the events described above occurred. A pretrial detainee's medical care claim brought under the Fourteenth Amendment is subject to the objective unreasonableness inquiry identified in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), rather than the deliberate indifference standard relevant for convicted prisoners. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). The relevant inquiry is two steps. "The first step, which focuses on the intentionality of the individual defendant's conduct, remains unchanged [from the

9

deliberate indifference standard] and 'asks whether the [] defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case.'" *McCann v. Ogle County, Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) (quoting *Miranda*, 900 F.3d at 353). In the second step, a plaintiff must demonstrate the defendant's conduct was objectively unreasonable. *Miranda*, 900 F.3d at 353. This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have violated the plaintiff's rights and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable. *McCann*, 909 F.3d at 886. "A detainee must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Miranda*, 900 F.3d at 353.

**A.**  **Brady**

Summary judgment for Brady must be denied because there are questions of material fact as to whether her response to Jones' medical condition was objectively reasonable.

Although Brady is a social worker and not a medical care provider, a reasonable jury could conclude that she acted purposefully, knowingly, or recklessly when she considered the consequences of her handling of Jones' care. *Miranda*, 900 F.3d at 352–53. Brady observed signs of physical distress from Jones' arrival until his transport to the hospital. (Dkt. 125-4.) She was concerned that he could be withdrawing from methamphetamine, *id.* at 2, and was aware that drug users experiencing withdrawal should be under the care of a doctor or nurse, (Dkt. 125-5 at 16:20–25; 90:11–14). She told Jones on multiple occasions that she needed to discuss his issues with medical staff. (Dkt. 125-3 at C-3, C-4.) Social workers at the Jail are expected to collaborate with medical staff and alert them to medical issues. Brady did not discuss Jones' problems with medical staff at the Jail or medical staff employed by Lifespring. Rather, she "deliberately chose a 'wait

10

and see' monitoring plan" despite personally observing Jones' deterioration. *Miranda*, 900 F.3d at 354 (quoting *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017)).

A jury could also conclude that Brady's response to Jones' condition was objectively unreasonable. Brady emphasizes that as a social worker, she is tasked with providing mental health care rather than medical care. "When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention." *Miranda*, 900 F.3d at 343. But Brady is in a quasi-medical role as a mental health care provider. And although an inmate like Jones should typically be under medical care, a miscommunication in the Jail prevented that from occurring. *See id.*, (noting that jail officers "received assurances" that medical staff were monitoring inmate and were informed that the inmate would be sent to the hospital if necessary). Brady could not rely on medical staff's assessment of Jones' situation if that assessment never took place. It was Brady who saw Jones in physical distress on several occasions and knew that he had chronic medical issues including encephalitis, HIV, and substance abuse disorder. She told him she would need to consult with medical about some of his questions. Jones may have never asked Brady for medical care, but based on her personal observations that Jones had difficulty following directions, had slurred speech, and was not oriented to his surroundings, a jury could conclude that Jones did not have the capacity to seek medical aid for himself. Also, because Jones was in the padded cell, he had no access to the kiosk to submit a healthcare request. Under the totality of the facts and circumstances, there are material questions of fact with respect to whether Brady provided objectively unreasonable medical treatment. *McCann*, 909 F.3d at 886.

Brady also argues that she was not medically trained to recognize that Jones was suffering from hypothermia, sepsis, septic shock, pneumonia, and incontinence. That may be so, but it is not the relevant inquiry. The question is not whether Brady could properly diagnose Jones but rather whether she responded reasonably to a serious medical need. "An objectively serious

11

medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (internal citations omitted). A reasonable jury could conclude that Jones' observable symptoms, including a lack of orientation, were obvious signs of a serious medical need and that Brady recklessly delayed medical help. *See Foelker v. Outagamie County*, 394 F.3d 510, 513–14 (7th Cir. 2005) (reversing grant of summary judgment in favor of social worker finding that "she may not have understood the severity of the situation and might have negligently believed that Foelker did not need additional medical attention. But drawing all inferences in Foelker's favor … a reasonable jury could also conclude that she allowed Foelker to suffer from the effects of his withdrawal.").

For the foregoing reasons, the defendants' motion for summary judgment is **denied** as to Brady.

**B.**     **Lifespring**

Because Lifespring acts under color of state law by contracting to perform a government function, *i.e.* providing mental health care to the Jail, it is treated as a government entity for purposes of § 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). As such, Lifespring "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional … policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005–06 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690–91 (1978)).

Therefore, to establish a violation of his rights under the Fourteenth Amendment, Jones must establish that he suffered a constitutional deprivation because of an express policy or custom of Lifespring. Jones must show that Lifespring has: (1) an express policy that, when enforced,

caused a constitutional deprivation; (2) a practice that is so wide-spread that, although not authorized by written or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) an allegation that the constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758−759 (7th Cir. 2004); *see also Teesdale v. City of Chicago*, 690 F.3d 829, 833–34 (7th Cir. 2012) (noting policy or custom must be the "moving force" behind the deprivation of constitutional rights). In addition, the failure to make policy itself may be actionable conduct. *Glisson*, 849 F.3d at 381.

Jones alleged in his Complaint that Lifespring was responsible for Jones's injuries due to their failure (1) to adequately train and supervise Brady, (2) to adequately staff the Jail with sufficient medical professionals, and (3) for failing to establish protocols for responding to inmates' medical needs. (Dkt. 1 at ¶¶ 49, 52.) In response to the defendants' motion for summary judgment, however, Jones abandons his failure-to-train and failure-to-promulgate-policy claims and argues only that Lifespring is liable for failure to supervise Brady by not enforcing its policies. (*See* Dkt. 125 at 18–20.)

As the Seventh Circuit recently explained, "Failure-to-supervise claims, like failure-to-train claims, are a tenuous form of *Monell* liability. This is because such claims seek to hold a municipality liable not for directly inflicting injury, as was the case in *Monell*, but rather for causing an employee's misconduct." *Ruiz-Cortez v. City of Chi.*, 931 F.3d 592, 599 (7th Cir. 2019) (internal citations omitted). A failure-to-supervise claim is "subject to 'rigorous' fault and causation requirements." *Id.* (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 405 (1997). As to fault, Jones must show that Lifespring acted with deliberate indifference by failing to supervise Brady. *Id.* (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). To do so, Jones must provide evidence of a "pattern of similar constitutional violations" or show that the decision not to supervise Brady created an obvious risk that a constitutional violation would occur.

*Connick*, 563 U.S. at 62–63 (citing *City of Canton v. Harris*, 489 U.S. 378, 390, n.10 (1989)). In other words, absent a pattern, "a single incident can be enough for liability [only] where a constitutional violation was highly foreseeable." *Miranda*, 900 F.3d at 344.

Jones has produced no evidence of a pattern of poor supervision by Lifespring resulting in Lifespring employees failing to render necessary medical aid. And there is no indication that a lack of supervision was the "moving force" behind Brady's actions. *Ruiz-Cortez*, 931 F.3d at 600. This Court denied summary judgment for co-defendant Charlestown Primary Care, finding that it was foreseeable that a complete absence of *training* for jail staff could result in a failure to recognize when an inmate needed medical attention. (Dkt. 98 at 12–13.) But here, it is neither obvious nor foreseeable that Lifespring's failure to *supervise* Brady would result in a constitutional violation. Lifespring, unlike Charlestown Primary Care, provides mental health care. There were policies in place that required coordination between mental health staff and medical staff, which a jury could conclude Brady failed to follow. Because there is no *respondeat superior* liability for Lifespring, it is not liable for Brady's actions. *Ruiz-Cortez*, 931 F.3d at 598–99.

For the foregoing reasons, the defendants' motion for summary judgment is **granted** as to Lifespring

## V. CONCLUSION

The defendants' motion for summary judgment, Dkt. [105], is **GRANTED** as to Lifespring but **DENIED** as to Teresa Brady. **The Clerk is directed to terminate** Lifespring as a defendant in this action. The parties are scheduled for a settlement conference on July 26, 2021, and the trial remains scheduled for September 13, 2021.

**SO ORDERED.**

Date: 7/12/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Laura Elizabeth Landenwich
ADAMS LANDENWICH WALTON, PLLC
laura@justiceky.com

Katherine Elizabeth Tapp
KIGHTLINGER & GRAY LLP
ktapp@k-glaw.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY LLP
jlowe@k-glaw.com

Ashley Roncevic
HOLLINGSWORTH ROBERT MEANS, LLC
aroncevic@hrmlaw.com

Jaime L. Meyer
HOLLINGSWORTH ROBERT MEANS, LLC
jmeyer@hrmlaw.com

Jeffrey D. Roberts
HOLLINGSWORTH ROBERT MEANS, LLC
jroberts@hrmlaw.com